**J.O. FARMER, Appellant,**

v.

**Bill FORD, Jr., James S. Jackson, Harrell Lee and Robert Suttle, Trustees of Parris Management Trust, Appellees.**

**No. 73022.**

Court of Appeals of Oklahoma, Division No. 2.

June 4, 1991.

Frank Sullivan, Jr., Sallisaw, for appellant.

Greg Thomas, Muskogee, for appellees.

BRIGHTMIRE, Judge.

The issue presented for review is whether the defending trustees of a defunct money management trust are entitled to a summary judgment against an alleged depositor of funds who is suing to recoup his life savings.

The trial court held that they were and granted them judgment. We, however, hold they were not and reverse.

## I

The pleadings, admissions, and depositions disclose the following facts, some of which are in dispute.

The plaintiff, J.O. Farmer, moved his family to the Sallisaw, Oklahoma, area in 1967. Not long after that one Bob Parris began preparing the Farmers' income tax returns. A few years later, Farmer—an appliance store owner—complained to Parris about the amount of taxes he, Farmer, was having to pay.

"I can't keep you from having to pay tax," Parris told him, "but we can defer it until you retire...."

Farmer sought more information. Parris explained that he had "an investment company that could put [Farmer's money] in stocks and bonds, CD's [sic] and draw approximately the same amount of interest that we were getting at the bank," and that "they had a board that took care of it."

As a result, Farmer and his wife gave Parris a check for $1,004 to put in an IRA account with Parris Management Service, Inc. A few days later, on March 26, 1981, Farmer and his wife wrote a check for $50,000 to Parris Management Service, Inc., and were issued a receipt "for 50 Shares of Stock."

Farmer said he did not know a trust was involved until he invested more funds in April 1982. At that time he asked Parris for more information about the trust.

"We take this money and put it in a trust," Parris said, "we invest it." "And," said Farmer, "he named off—their board of directors," which was made up of the defendants and others. Plaintiff was familiar with all of them, of course, as Parris knew he would be.

Farmer said he never asked why his checks were not made out directly to the trust, saying, "I just assumed he [Parris] was taking this and putting it in an investment. I'm sure he didn't invest every day. When he got ready to invest the money, he drawed it out of this and put it in the investment."

Over the next four years, Farmer turned a total of $110,000 over to Parris. From time to time Farmer not only talked to Parris but trustees Bill Ford and James Jackson, and would ask them how his money was doing. He sought information from those defendants because:

"they were members of the trust and not members of Parris Management Services, Inc., [and] if I'd ask them the question how is our money doing, I would assume that's the monies that they are helping to take care of, they're meeting and going through the books and everything."

The trustees would always tell him his money was doing "fine" and "okay." Then, in "the early part of May or June of 1986" the Farmers' retirement dream began to transform into a nightmare. Farmer described the metamorphosis this way:

"My wife and I went through a death where there was no will. So we went over and got a will made. I had a son that was killed and he has two sons. So we had decided to set up a trust fund. That may be a dirty word. But we decided to set up a trust fund for my two grandsons. We got our will drawed up, got all of the papers ready, went over to get Bob [Parris] to get the money to put into a trust.

. . . .

And I saw Bob [Parris] and [defendant trustee] Bill Ford come out of one of the local attorney's office. I got Bob [Parris] on the sidewalk and told him that I needed some money to put into a trust for my grandkids. He told me that he didn't have the money, that [GMAC] had it all tied up.

. . . .

"Yes. I said, Bob, I don't have any money that I know of invested in GMAC. You've got my money and I want it. I don't have it; it's all tied up. So he turned to leave. Bill Ford motioned to me, went across the street. And the words that Bill told me is, J.O., the son of a bitch has stoled our money. I said what do you mean stoled our money. Then this is the first time I become aware of a Trust A or a Trust B.

. . . .

"He said he had his money in Trust A or Trust B. You had your money in Trust A; that's all gone. There's approximately a hundred and twenty-five or a hundred and thirty-five thousand dollars in Trust B at Fayetteville, and I'm going to go get it tomorrow. I said, Bill, is any of that ours. He said no, that's mine and [trustee] Mrs. Milligan's. That's the first time I heard of a Trust A and Trust B.

. . . .

"Then a couple of three or four days later, whenever we had our meeting to discuss what to do, then it come out Trust A or Trust B. That's the first time I'd heard about it. And a whole bunch more of them, it's the first time they'd heard about it, too."

On March 16, 1987, Farmer filed his petition against certain trustees of Parris Management Trust alleging mismanagement of trust assets and breach of the trustees' fiduciary duties.[1]

Following a period of discovery the defending trustees moved for a summary judgment solely on the basis of certain statements made by Farmer during his deposition testimony and on some checks given to Parris which were made payable to "Parris Management Service" and "Parris Investment Co."[2] Their contention is that "Farmer, relied solely upon Bob Parris and depended upon him to manage his mon-

ey and property" and that Farmer "stated specifically that he advanced no funds to Parris Management Trust and as a consequence the alleged trustees of said trust could not mismanage funds that were never available."

Farmer objected to the defendants' motion citing their failure to (1) file a concise written statement of the material facts to which the movants contend no genuine issue exists; or (2) cite legal authority for "their position that since [Farmer] did not write any checks to a payee named 'Parris Management Trust' then [the trustees] must prevail." He framed one of the main material issues to be resolved this way: "Whether or not J.O. Farmer paid monies over to Bob Parris, at the direction of Bob Parris, as manager of the Parris Management Trust." In other words, Farmer had urged that it was material to determine whether he paid subject money to Parris in his capacity as agent for the trust; and whether the checks were made out as instructed by Parris.

Among the attached exhibits said to be illustrative of disputed facts supportive of the plaintiff's theory of recovery were (1) the "Contract of Employment of Manager of Trust"—an agreement in which the trustees hired Parris as manager of the trust; (2) a verified petition in a lawsuit filed by the trustees against Parris and others, accusing Parris of "enticing other investors and beneficiaries to invest in the Trust" and alleging that he "has accepted and receipted monies purportedly destined for Parris Management Trust and has received large sums of money in the name of Parris Management Service, Inc.," and that as a result such funds "should be declared the property of Parris Management Trust;" and (3) excerpts from Farmer's deposition wherein he testified that at least one of the defending trustees acknowledged familiarity with Farmer's investment involvement with Parris on behalf of the trust, and in

---

1. Farmer said he declined to name two trustees as defendants—Mrs. Milligan and Mrs. Teague—because "I don't think we should sue old women or widows." Farmer sought damages of $110,000 plus interest and fees.

2. The back side of the checks are not shown so we have to assume they were deposited to a Parris Management Service, Inc., account rather that being endorsed over to the trust for deposit.

fact implied that Farmer's money was in the trust.

On March 17, 1989, however, the trial court found that "there is no genuine issue of fact in controversy in this matter" and sustained the defendants' motion for summary judgment. The plaintiff appeals.

## II

The sole issue, then, is whether the trial court erred in summarily adjudicating the lawsuit.

We hold that it did. When a summary judgment is challenged, the appellate court must examine the pleadings, depositions, affidavits and other evidentiary materials submitted by the parties and consider all facts and inferences contained therein in the light most favorable to the nonmovant. *Redwine v. Baptist Medical Center of Oklahoma, Inc.*, 679 P.2d 1293 (Okl. 1983). It is only where there is no substantial controversy as to a material fact and the uncontroverted facts and circumstances fail to support a reasonable inference favoring a well-pled theory of the party against whom judgment was granted that the movant is entitled to summary judgment as a matter of law. *Hinson v. Cameron*, 742 P.2d 549 (Okl.1987). Or to put it differently, if the record reveals either controverted material facts or, if the uncontroverted facts support legitimate inferences favoring a claim of the party against whom a summary judgment is granted, the judgment will be reversed. *Ross v. City of Shawnee*, 683 P.2d 535 (Okl.1984).

Contrary to the issue framed by the trustees, the question is not whether Farmer actually paid money to the trust. Clearly he did not. The issues to be resolved include: (1) Whether Parris was acting with actual or apparent authority to solicit funds for the trust and direct that such funds be deposited in Parris Management Service, Inc., or Parris Investment Company to be held by those entities for the use and benefit of the trust pending investment; (2) Whether there was actually a Trust A and Trust B, and if so did the trustees create or use such trust categories

to improperly protect their own interests at the expense or exclusion of non-trustee investors; and (3) Whether the trustees used a high degree of care and diligence to protect trust assets from mismanagement, misuse, diversion or embezzlement of funds by Parris or anyone else.

The deposition testimony of Farmer alone is sufficient to raise questions of fact as to the nature and extent of the representations made to him by Parris on behalf of the trustees; the extent and nature of representations made to him by some of the trustees; the knowledge of the trustees regarding Farmer's involvement with Parris as well as Farmer's belief that the trustees were exercising control over the money he had paid to Parris; and whether Parris was operating within the scope of his authority as manager of the trust thus imposing vicarious liability on the trustees. These are at least some of the questions of fact which must be resolved by the trier of fact.

The summary judgment appealed is therefore reversed and remanded for further proceedings.

REIF, P.J., concurs.

MEANS, J., concurs in result.

MEANS, Judge, concurring in result.

The single question on appeal is the correctness of the trial judge's ruling which sustained Defendant's motion for summary judgment. The motion contains a single issue.

The validity of such a ruling depends upon the parties presenting their issues pursuant to the dictates of District Court Rule 13, 12 O.S.Supp.1990, ch. 2, app. This results in the record presented to the trial judge for consideration. The trial judge then must rule on the summary judgment issues on the record presented and not on a record potentially possible. *Northrip v. Montgomery Ward Co.*, 529 P.2d 489, 494 (Okla.1974).

The consequences to an objecting party of a failure to comply with the rules are found in the final sentence of Rule 13(b) which states:

If the motion for judgment is granted, the party or parties opposing the motion cannot on appeal rely on any fact or material that is not referred to or included in the statement in order to show that a substantial controversy exists.

The trial court's proceedings are flawed because none of the parties complied with the requirements of Rule 13. The resulting decision by the trial judge was not a fully informed decision and does not support a summary disposition of the case. I would reverse the summary judgment and remand for proper consideration of the issue raised.